# Illinois Official Reports

## Appellate Court

*Snow v. Power Construction Co.*, 2017 IL App (1st) 151226

| | |
|---|---|
| Appellate Court Caption | JOHN T. SNOW, Plaintiff-Appellant, v. POWER CONSTRUCTION COMPANY, LLC, an Illinois Limited Liability Company, THORNE ASSOCIATES, INC., an Illinois Corporation, and POWER CONTRACTING AND ENGINEERING CORPORATION, an Illinois Corporation, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-1226 |
| Rule 23 order filed<br>Motion to publish allowed<br>Opinion filed | December 22, 2016<br><br>April 12, 2017<br>May 4, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-3597; the Hon. Eileen Brewer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel E. Compton, of Compton Law Group, of Elgin, for appellant.<br><br>Patricia J. Hogan, Yaro M. Melnyk, and James F. Maruna, of Cassiday Schade LLP, of Chicago, for appellees Power Construction Company, LLC, and Power Contracting and Engineering Corp.<br><br>Robert J. Franco, Christopher G. Beunik, and Christopher M. Cano, Franco & Moroney, LLC, of Chicago, for appellee Thorne Associates, Inc. |

| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Ellis and Justice Burke concurred in the judgment and opinion. |
|---|---|

**OPINION**

¶ 1        Plaintiff John T. Snow filed a negligence action against defendants Power Construction Company, LLC (PCC), Power Engineering and Contracting Corporation (PCEC) (collectively Power), and Thorne Associates, Inc. (Thorne), after he was injured when several sheets of drywall fell on him while at a construction site. Plaintiff was employed by third-party defendant, Professionals Associated Construction Layout & Survey Co., Ltd. (Professionals), as a surveyor and was on the site in his professional capacity. The trial court granted summary judgment in favor of PCC, PCEC, and Thorne.

¶ 2        Plaintiff appeals, arguing that the trial court erred in (1) granting summary judgment because there was a material question of fact regarding the stacking of the drywall and the responsibility for safety of persons on the jobsite, (2) ruling that reliance on an alleged custom and practice could make an injury unforeseeable as a matter of law, (3) striking portions of the affidavits of plaintiff and Richard Hislop tendered in response to the motions for summary judgment, and (4) quashing the notice of deposition for Jeff Karp, president of PCC.

¶ 3        In May 2010, Alexian Brothers Health System (Alexian), as the owner, entered into a contract with PCEC, as the construction manager, for the construction of the new children's hospital and bed tower (bed tower site) at St. Alexius Medical Center (St. Alexius) in Hoffman Estates, Illinois. In May 2011, PCEC entered into a project specific agreement with Professionals to perform surveying work at the bed tower site. A master subcontract agreement between PCC and Professionals, from October 2004, governed the project specific agreement and was incorporated by reference. Also in May 2011, PCEC entered into a project specific agreement with Thorne to perform framing and drywall assembly at the bed tower site. A master subcontract agreement between PCC and Thorne, dated November 2003, governed and was incorporated by reference.

¶ 4        As part of Thorne's subcontract, it was to construct a temporary corridor connecting the emergency room of the hospital to the new construction. On June 29, 2011, Thorne completed its installation of drywall in the temporary corridor. At the end of the work day, Thorne's employees vertically stacked approximately 14 sheets, 4 by 8 feet high, of leftover drywall near the entrance to the corridor. The next morning, on June 30, 2011, plaintiff came to the bed tower site to check his previously placed benchmarks in the corridor. Plaintiff believed one of his benchmarks was behind the stacked drywall. He then moved the stack toward himself to check for his benchmark, but the stack continued to move and fell forward. Plaintiff was struck on his right leg and trapped under the drywall. He immediately sought care at St. Alexius.

¶ 5        Plaintiff initially filed his negligence action in April 2012. In December 2012, plaintiff filed his second amended complaint with one count directed at each of the defendants. The allegations against PCC and PCEC are identical. The complaint asserts that both PCC and PCEC were the general contractor for a project at the east pavilion of St. Alexius. Both PCC

and PCEC retained some control over the safety of the work on the project. PCC and PCEC each had a duty to exercise that control with ordinary care. PCC and PCEC were individually guilty of one or more negligent and careless acts or omissions: (1) caused drywall to be stacked or stored in such a manner as to easily topple over; (2) allowed drywall to be stacked or stored in such a way and in such a manner as to be easily tipped or toppled over; (3) failed to brace drywall stacked in a vertical manner when it knew or should have known that drywall so stored or stacked could easily tip over, causing injury; (4) failed to move, alter, or correct drywall stacked or stored in an unsafe manner or direct that drywall so stacked or stored be moved, braced, or corrected; (5) scheduled work of the subcontractor Professionals such that its employees would have to move or disturb stacked or stored drywall, and (6) failed to assure that the drywall was stacked, racked, blocked, interlocked, or otherwise secured to prevent sliding, falling, or collapse. As a result of one or more of these acts or omissions, the vertically stacked drywall fell and struck plaintiff, trapping him underneath and causing injury to his back and legs. As a direct and proximate result of said accident, plaintiff has experienced and will continue to experience pain, suffering, disability, loss of normal life, and lost income.

¶ 6    The third count of the complaint pled the following allegations against Thorne. Thorne was a drywall subcontractor at the St. Alexius site, and it stacked, moved, and stored drywall, specifically the drywall involved in the accident which injured plaintiff. Thorne had a duty to use due care in its stacking, storage, and moving of drywall so as not to cause an unsafe condition, which might injure plaintiff and other employees on the project. Thorne was guilty of one or more negligent and careless acts or omissions: (1) stored or stacked drywall in an area that was neither safe nor authorized; (2) caused drywall to be stacked or stored in a manner such that plaintiff could move or dislodge it; (3) failed to brace, band, or secure the drywall in such a manner that it would not tip or fall; (4) improperly stacked the drywall; and (5) was otherwise careless and negligent. As a result of one or more of these acts or omissions, the vertically stacked drywall fell and struck plaintiff, trapping him underneath and causing injury to his back and legs. As a direct and proximate result of said accident, plaintiff has experienced and will continue to experience pain, suffering, disability, loss of normal life, and lost income.

¶ 7    The parties engaged in lengthy discovery, which included all relevant contracts as well as several depositions of employees of PCC, PCEC, Thorne, and Professionals. The contract between Alexian and PCEC included the following provisions in the general conditions of the contract for construction.

¶ 8    Article 1.1.3 detailed the work under the contract.

"The term 'Work' means the construction and services required by the Contract Documents, whether completed or partially completed, and included all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project. The Work shall also consist of labor, materials, equipment and services provided or to be provided by Subcontractors, Sub-subcontractors, material suppliers or any other entity for whom the Contractor is responsible under or pursuant to Contract documents, and specifically includes the duty to supply all necessary supervision and coordination of all forces furnished by and through Contractor."

¶ 9    Article 3.3 governs the supervision and construction procedures. Article 3.3.1 stated, in relevant part, as follows:

- 3 -

"The Contractor shall supervise and direct The Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof, and except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures."

¶ 10 Article 3.3.2 provided that:

"The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors and for any damages, losses, costs or expenses resulting from such acts or omissions."

¶ 11 Article 5.3 concerned the subcontractual relations of the contract. Article 5.3.1 provided, in relevant part, that:

"By appropriate agreement, written where legally required for validity, the Contractor shall require each subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect."

¶ 12 Article 10.1 detailed the safety precautions and programs under the contract. Article 10.1.1 provided that, "The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract."

¶ 13 Article 10.2 governed safety of persons and property. Article 10.2.1.1 provided, in relevant part:

"The Contractor shall take all necessary precautions for safety of, and shall provide all necessary protection to prevent damage, injury or loss to *** all persons involved in or affected by the Project."

¶ 14 The master subcontractor agreements between PCC and Professionals, and PCC and Thorne, respectively, contain the following identical provisions.

¶ 15 Under Article 1,

"The Subcontractor shall provide and pay for all labor, materials, tools, plan, supplies, scaffolding, transportation, insurance, taxes, equipment, competent full-time supervision, and all other services and do all things necessary for the proper and complete performance, installation, and construction of all of the work identified in the attached Project Specific Agreement."

¶ 16 Under Article 27, subpart C, the master agreement stated:

"Subcontractor shall be and is fully responsible for protection and condition of its materials, Work or equipment installed or stored on Job Site or elsewhere until final acceptance thereof by Owner and Architect."

¶ 17 Article 28 of the master agreement provided the following policy on the use of equipment.

"If, at any time during construction of Work covered by the Contract, the Subcontractor, its agents, employees or supplies should, either with or without permission of General Contractor, use any tools, appliances, hoists, elevators, scaffolding, ladders, falsework, shoring, materials, machinery or equipment which belong to or are furnished by General Contractor, Subcontractor assumes full responsibility for any injury to person or property which may result from or in connection with use of any such tools, appliances, hoists, elevators, scaffolding, ladders, falsework, shoring, materials, machinery or equipment by Subcontractor, its agents, employees or suppliers."

¶ 18    The project specific agreement between PCEC and Thorne included several general provisions:

"The Scope of Work shall include, but is not necessarily limited to, furnishing all labor supervision, safety, protection, clean-up, insurance, materials, fixtures, equipment, tools, supplies, transportation, other property and services to complete the GYPSUM BOARD ASSEMBLY work as identified in the plans, specifications, bid documents, and as listed herein.

* * *

This subcontractor is responsible for the protection of all stored and installed materials until final acceptance by the owner of this work."

¶ 19    On September 25, 2013, the trial court entered a case management order setting the close of discovery. The court ruled that plaintiff would be permitted to depose the Power employees already noticed for depositions but no further depositions would be allowed. On October 30, 2013, plaintiff issued a deposition notice for Jeffrey Karp, the president and CEO of PCC. On November 4, 2013, PCC moved to quash the deposition notice as untimely and in violation of the court's order. The trial court granted PCC's motion to quash in May 2014.

¶ 20    Plaintiff testified at his deposition that he was 60 years old and had been working as surveyor since 1975. He was employed by Professionals since 1996. Plaintiff had previously used spray paint to denote his benchmarks on an existing brick wall that was used for the corridor. Plaintiff had returned to the jobsite to check the benchmark to determine if the building was settling. He generally came to the site once a week. Between June 20 and June 30, the corridor was constructed at the jobsite. Plaintiff had previously checked the benchmarks from outside, but now had to go into the corridor to view the benchmarks.

¶ 21    Plaintiff was directed to go to the bed tower site by his boss at Professionals, Larry Nowlin. On June 30, 2011, Plaintiff arrived at the site shortly before 7 a.m. He did not check in with anyone on site to indicate that he was there. He proceeded to the corridor, which had temporary lighting with materials and equipment stored inside, including several sheets of drywall leaning against the brick wall. Plaintiff did not bring his field notebook with him to show the exact locations of the benchmarks. He identified an area where he believed one benchmark was located, which was behind the drywall sheets. There were 14 sheets of 4 by 8 feet drywall leaning against the wall. The drywall was stacked four feet high and eight feet across against the wall. Plaintiff's benchmark was four feet above the floor and he believed it was near the top of the wall covered by the drywall. Plaintiff then "twisted" his fingers to move the drywall away from the wall to locate the benchmark. As he moved the stack of drywall, the stack continued to move forward and struck the middle of plaintiff's right leg.

¶ 22    Plaintiff admitted that he did not ask anyone for help to move the drywall. He stated that he did not know if it needed to be moved out of the way. If he had needed to move the drywall, he had the phone number for Paul Meyer, PCC superintendent. Plaintiff admitted that "almost every time" in prior instances if he arrived and something was in his way, he could call to have it moved. He also admitted that Professionals' policy required him to ask for assistance from a contractor whose material blocked his work. Plaintiff stated that he has never performed drywall work on any job site nor did he ever receive training in drywall work. Plaintiff further stated that prior to this project, he had never attempted to move drywall to observe a benchmark and had never handled drywall before the accident. Plaintiff conceded that a benchmark was not located behind the drywall. He stated that he only moved the drywall approximately an inch before it fell. Plaintiff testified that the drywall would not have fallen if he had not manipulated it with his hand.

¶ 23    Paul Meyer testified that he was employed as a superintendent for PCC at the bed tower jobsite. He stated that Thorne completed the drywall installation in the corridor at the end of the day on June 29. He instructed Thorne employees to store their remaining drywall sheets in the corridor, away from the points of ingress and egress to prevent a safety hazard. He testified that he did not direct Thorne to store the drywall horizontally or vertically. He did not consider storing drywall vertically on its edge leaning against a wall to be an unsafe practice. Meyer agreed that PCC's safety manual provides that "materials shall be stacked in a manner to prevent tipping, falling, shifting or rolling." He stated that subcontractors remain responsible for the storage of their materials until final acceptance of their respective work by PCC. If he had observed the drywall stacked in an unsafe position, he would have directed Thorne to correct its storage.

¶ 24    Meyer testified that it is custom and practice that one subcontractor was not permitted to move the materials of another subcontractor. The subcontractor was required to contact him to coordinate the moving of the materials. He was not contacted by plaintiff to move the drywall.

¶ 25    Shaun Rainey testified that he was employed by PCC as its safety director. As safety director, he has the power to stop a subcontractor's work if he observed danger. He stated that the subcontractors are required to conduct weekly toolbox talks, but the content of the talks is left to the discretion of the individual subcontractor. Rainey stated that it is industry custom and practice for one subcontractor to refrain from moving another subcontractor's materials.

¶ 26    On June 30, Rainey arrived at the bed tower site at 7 a.m. and did not have a chance to walk through the jobsite prior to plaintiff's accident at 7 a.m. Rainey went to the corridor after being notified of the accident. He took photographs of the corridor after the accident but did not have any photographs of the drywall before it fell. He did not know the angle at which the drywall was stored prior to being moved by plaintiff. Rainey stated that the drywall belonged to Thorne. He stated that the drywall was stored securely by leaning it vertically against the wall and would not have fallen without plaintiff's actions. He testified that Thorne chose the specific location and method for storing the drywall.

¶ 27    David Glosson testified that he was employed as a foreman with PCC at the bed tower site. At the time of the accident on June 30, he was in his office in the trailer at the site; Meyer and Rainey were in their respective offices in the trailer. He responded to the accident site and saw plaintiff on the ground, but the drywall was not on top of him. Glosson asked plaintiff what happened, Glosson stated that plaintiff told him that he "did a stupid thing. I tried pulling the drywall back and it fell on top of me." Glosson completed a statement report about the

accident. In his report, he stated that the drywall was "stacked neat," which he explained as "stacked appropriately against the wall. *** [I]t was a proper stack." Glosson did not observe the Thorne employees stacking the drywall the previous night. He admitted that he had not observed the drywall prior to the accident. He could not state the angle the drywall was against the wall. He stated that the sheets were five-eighths of an inch thick.

¶ 28        Glosson testified that leaning the drywall against the wall was safer than storing the material on a drywall cart because the cart could tip over if someone who was not trained pushed the cart. Glosson stated that in his experience, you did not move another entity's materials. If he had seen the drywall in the wrong spot, he would have contacted the drywallers to move it.

¶ 29        Michael Degnan testified that he was employed as Thorne's superintendent and vice president of operations. He stated that Thorne's policy to store drywall was to stack it on its edge and lean it against the wall; and it conforms with industry custom and practice. He said that when the drywall is leaned against the wall at a proper angle, then no braces, clips, or other securing mechanism is required. He stated that drywall leaned against a wall would tip "only if somebody touched it and moved it." He testified that Thorne was responsible for protecting all stored material until final acceptance of finished work by Power. Degnan agreed that under the contracts, Thorne was required to furnish all labor, supervision, protection, clean-up, insurance, materials, fixtures, equipment, tools, supplies, and transportation. Thorne's foreman David Pruitt would have been responsible for getting approval from Power regarding storage locations for the drywall and other material. Degnan stated that he would expect Thorne employees to ask Power where to store excess drywall but not how to stack and store it. Degnan testified that people are "not supposed to touch anybody else's material on the job."

¶ 30        David Pruitt testified that he was employed by Thorne as a carpenter foreman at the bed tower site. He stated that Thorne began installation of drywall in the corridor on June 24, 2011, and completed installation on June 29, 2011, at around 3 p.m. Meyer directed him to have Thorne employees place the leftover materials at the south end of the corridor. Pruitt stated that Thorne employees stacked the drywall against the brick wall in the corridor. He testified that they did not leave the drywall on a cart because the drywall was going to be there for a while and someone who did not know how to move it might have moved the cart during that time. Pruitt said the drywall was leaned vertically against the wall rather than flat on the ground because it was "such a tight area." He said it was "more of a tripping hazard" on the ground. Pruitt did not come to the site to restack the drywall after the accident and did not know how it was restacked. He testified that it was "common sense" to "lean the drywall so the weight is against the wall that you're leaning against." He indicated that he tried to lean it steeply enough so that it is difficult to pull away from the wall but not so much that it would slide down. He did not stack the drywall flat against the wall. Pruitt stated that he has never seen or used a brace or clip for drywall when vertically stacked. He testified that when he left the project on June 29, the drywall was vertically stacked against the wall in a safe and proper manner. Pruitt said the drywall was stacked four feet high, and one would have seen the benchmark above the vertically stacked drywall. He stated that it is common knowledge on a construction site not to move another person's materials. He agreed that someone who is not trained in handling drywall should not attempt to move it.

¶ 31        Oscar Ron testified, through an interpreter, that he was employed as a carpenter for Thorne. He was part of the crew that worked on the corridor at the bed tower site. He stated that Pruitt

did not do any drywall on the last day of drywall installation. Ron did not know what Pruitt did that day. Ron testified that he spoke to Meyer regarding Thorne's completion of the drywall and asked where he wanted them to put everything. Meyer told him to "put it on the edge, everything together, without blocking the hallway." Ron stated that he spoke with Meyer because Pruitt had left, but he could not recall when Pruitt left, if he left before or after lunch or after the afternoon break. Ron said he was in charge when Pruitt was not present. Ron stated that if the drywall was going to obstruct the hallway, they could not lay it down. He said it was normal to place it leaning, and he decided to place it that way because he did not want material blocking the hallway. Ron did not use a brace for the drywall "because it was secure the way that we had set it." Ron described the drywall as "leaning at an angle to where it can't fall over or slide off." He could not say the exact angle, but "as you're putting the sheets one can feel that the sheets aren't going to fall." He was "sure" that the sheets would not fall.

¶ 32 Larry Nowlin testified that he was employed as a superintendent with Professionals. He stated that it was industry custom and practice, including the policy of Professionals, that a surveyor was not to move materials that blocked a benchmark. The surveyor was to contact the general contractor to coordinate the movement of the materials. Nowlin admitted that this was not a written policy but said it had been communicated to his employees, which he believed included plaintiff. If the surveyor is unable to read the benchmark, he should record it as "blocked" or "obstructed" and move to the next benchmark. The surveyor can return the next week and read the obstructed benchmark. Professionals would not take disciplinary action against a surveyor who indicated a benchmark was obstructed. Nowlin stated that he directed plaintiff to go to the bed tower site on June 30 to check the benchmarks. He said that plaintiff generally worked with a partner, but the partner was on vacation that week.

¶ 33 Matthew Murtha testified that he was employed by Professionals as the project manager. He does not work as a surveyor. He stated that when a surveyor could not read a benchmark because of a blockage, then the surveyor should record it as "blocked" or "covered." He did not know of any surveyor moving material to view a blocked benchmark. Murtha agreed that plaintiff's action in moving the drywall violated Professionals' rule not to move materials.

¶ 34 In July 2014, PCC filed a motion for summary judgment. In its motion, PCC argued that plaintiff cannot prove that PCC owed him a legal duty or that PCC breached any alleged duty. PCC asserted that it did not enter any of the contracts in relation to the bed tower site, rather it was PCEC, a separate entity, and thus, PCC had no retained control over Thorne's work. Further, PCC contended that it had no actual or constructive knowledge of a dangerous condition or unsafe work practice prior to plaintiff's accident because deposition testimony showed that storing drywall on its edge against a wall is an industry custom and practice that is not dangerous and complies with Occupational Safety and Health Administration (OSHA) standards. The drywall was not a dangerous condition until plaintiff's actions moving it. PCC maintained that the record showed there was no genuine issue of material fact to preclude summary judgment.

¶ 35 Plaintiff filed his response to PCC's motion for summary judgment. Plaintiff maintained that there was a question of fact regarding PCC's control over the means and methods of storage of the drywall. Plaintiff included an affidavit from his expert Richard Hislop as an exhibit to his response.

¶ 36 In his affidavit, Hislop stated that he was certified a safety professional with 40 years of experience in construction. Hislop discussed Power's safety program from its website, the

provisions of the contracts for the bed tower project, OSHA regulations, literature from the Gypsum Association, and safety warnings from multiple versions of the United States Gypsum Corporation's handbook. The OSHA regulation included in the affidavit stated, "All materials stored in tiers shall be stacked, racked, blocked, interlocked, or otherwise secured to prevent sliding, falling or collapse." 29 C.F.R. § 1926.250(a)(1) (1996). He then included several portions from the United States Gypsum Corporation guidelines from years 2000, 2003, 2007, and 2009. The handbook guideline from 2000 indicated a recommendation that gypsum board "be stacked flat because stacking boards vertically against a wall poses a safety hazard." Other provisions state that boards "stacked on edge can easily become unstable and accidentally fall over." The provision from the 2009 handbook detailed how to appropriately store the drywall panels vertically.

> "While vertical stacking of panel material can be appropriate and helpful it can also pose a falling hazard. When vertical stacking is used, be sure to leave at least 4" to 6" of space between the bottom of the first board in the stack and the wall. Leaving less than 4" creates a risk that the stack could be pulled over; leaving more than 6" applies too much weight laterally against the wall. Warning tape or signage should be used to alert people of the potential for leaning wallboard to fall if disturbed."

¶ 37    Hislop opined that PCC was wrong for contending that storing drywall on its edge was an industry accepted custom and practice based on his cited sources. Hislop then states, "Storing drywall on its edge against walls is common practice in residential construction and on occasion in commercial construction, however, injury statistics and experience have demonstrated that it is a dangerous practice to do so." He asserts that storing drywall vertically does not comply with his cited "OSHA regulations or the recommendations of the US Gypsum Association."

¶ 38    Hislop concludes that PCC failed in two regards.

> "1. Its first failure was to allow an unsafe condition identified in both OSHA regulations and the US Gypsum Association safety literature to remain unaddressed. Power failed to require that Thorne secure its sheetrock from sliding or falling, as subsequently occurred in this matter. This failure was a direct cause of the injuries sustained by [plaintiff].
>
> 2. Its second failure was that Power made no effort to assure that individuals who came to perform work on their jobsite were aware of the hazards that potentially existed there, specifically the hazards inherent in unsecured drywall."

¶ 39    Defendants filed a joint motion to strike Hislop's affidavit as improper under Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013) because his affidavit contained numerous conclusions unsupported by facts and referenced statistical facts without identifying the information source.

¶ 40    In November 2014, the trial court granted PCC's motion for summary judgment, finding that PCC had no duty to protect plaintiff from the drywall. The court noted that plaintiff had established questions of fact regarding whether PCC retained control over Thorne's placement of the drywall but concluded that "it would not be foreseeable by the general contractor that [plaintiff], as a surveyor working for one subcontractor would move another subcontractor's drywall." The court did not address PCC's motion to strike Hislop's affidavit because "the plaintiff's amended expert report fails to negate defendant's undisputed fact that it is an industry custom and practice that contractors will not move another contractor's material or

equipment, and the plaintiff's employers had procedures for surveyors to mark read sites as obstructed."

¶ 41    In February 2015, both PCEC and Thorne, respectively, filed motions for summary judgment. PCEC argued that summary judgment was proper because it owed no duty to plaintiff because (1) it did not retain or exercise control over subcontractors Thorne or Professionals, (2) it lacked notice of a dangerous condition because stacking drywall against a wall is not a dangerous condition, (3) it lacked notice of plaintiff's dangerous work practice against industry custom and practice to move the drywall, and (4) plaintiff's injuries resulted from his unsafe work practice and not from a condition of the land. Thorne asserted in its motion that it did not owe plaintiff a duty because (1) it was not foreseeable that plaintiff would move its stacked drywall, (2) it did not retain control over plaintiff's work and lacked knowledge of plaintiff's unsafe work practice, and (3) plaintiff's injuries were not caused by a dangerous condition of the land.

¶ 42    Plaintiff filed responses to the motions, which included an amended affidavit from Hislop and an affidavit from plaintiff. Hislop's amended affidavit added two paragraphs in which he stated that

> "it was custom and practice in the construction industry that unless specifically restricted contractors will regularly not only move other contractors' tools and materials, they will borrow ladders, Baker scaffolds and other materials. Contractors will regularly move material that is in their way in order to perform their job. Even if specifically restricted, unless the general contractor regularly enforces the restriction, contractors will borrow ladders and other materials to perform their job."

¶ 43    Plaintiff stated in his affidavit that there was no written policy or procedure by Professionals that "its employees not touch or move materials or equipment in order to find or uncover benchmarks or survey points." He said "there was never a rule that prohibited us from moving other company's supplies or equipment to find or measure survey points." He was never told by his coworkers, nor did they tell anyone in his presence, about "said" rule. He was never told at previous PCC jobs that employees were not to move other subcontractors' equipment or supplies. He referenced previous jobs in which he moved boxes or propane tanks to measure benchmarks. He stated that moving supplies was handled on a case-by-case basis, and if the supplies could be moved by Professionals' employees, then they moved it. Plaintiff said on the morning of his accident, if he had located a benchmark behind the drywall, then he would have requested assistance to relocate the drywall. At the time of the accident, he was "only trying to see whether there was a mark behind the drywall."

¶ 44    Both PCEC and Thorne moved to strike Hislop's affidavit pursuant to Rule 191(a) because the affidavit contained conclusions unsupported by facts, referenced statistical facts without identifying sources, and stated scientific claims without providing facts to show how he calculated his figures.

¶ 45    In April 2015, the trial court conducted a hearing on the motions. First, the court struck plaintiff's affidavit because it contradicted his prior sworn testimony from his deposition in which he testified that if a benchmark was covered, then you get someone to move whatever material was in the way. "Plaintiff's new affidavit contradicts the statement attempting to negate any knowledge of the procedure he needed to take if the material blocked the benchmark." Next, the court struck Hislop's "conclusory statements made in his amended affidavit, specifically that the industry standard does not require asking another subcontractor

or general to move the other subcontractor's material. *** Hislop's assertion is conclusory and provides no basis for his opinion." The court also struck conclusory statements regarding the force to pull the drywall, and whether the drywall was stacked in a dangerous manner. Finally, the court granted both PCEC's and Thorne's respective motions for summary judgment based on the same reasons as its ruling on PCC's motion.

¶ 46    This appeal followed.

¶ 47    On appeal, plaintiff argues that the trial court erred in (1) granting summary judgment in favor of each of the defendants because the evidence raised questions of material fact, (2) quashing his notice to depose Karp, and (3) striking his affidavit and portions of Hislop's affidavit.

¶ 48    Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, indicate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014). "Although a plaintiff is not required to prove his case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). We review cases involving summary judgment *de novo*. *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349 (1998).

¶ 49    "To state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). "The question of the existence of a duty is a question of law, and in determining whether a duty exists, the trial court considers whether a relationship existed between the parties that imposed a legal obligation upon one party for the benefit of the other party." *Sameer v. Butt*, 343 Ill. App. 3d 78, 85 (2003). In contrast, "whether a defendant breached the duty and whether the breach was the proximate cause of the plaintiff's injuries are factual matters for the jury to decide, provided there is a genuine issue of material fact regarding those issues." *Marshall*, 222 Ill. 2d at 430. " 'In the absence of a showing from which the court could infer the existence of a duty, no recovery by the plaintiff is possible as a matter of law and summary judgment in favor of the defendant is proper.' " *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 13 (quoting *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991)).

¶ 50    In the context of a construction-related injury, courts analyze whether there is common law negligence under section 414 of the Restatement (Second) of Torts. *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583, 587 (2002). Section 414 provides:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

¶ 51    "Whether a duty exists under section 414 turns on whether the defendant controlled the work in such a manner that he should be held liable." *Kotecki*, 333 Ill. App. 3d at 587. "As a general rule, one who entrusts work to an independent contractor will not be liable for the acts or omissions of that independent contractor." *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 340 (2008). "This is because the principal generally does not supervise

the details of the independent contractor's work and, as a result, is not in a good position to prevent negligent performance." *Pestka v. Town of Fort Sheridan Co.*, 371 Ill. App. 3d 286, 300 (2007).

¶ 52 Section 414 "provides a 'retained control' exception to the general rule that an employer of an independent contractor is not liable for the independent contractor's acts or omissions." *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 873-74 (2005). "The issue of a defendant's retained control may be decided as a matter of law where the evidence is insufficient to create a factual question." *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 41. Comment c to section 414 explains the concept of retained control for liability under the Restatement.

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c, at 388 (1965).

¶ 53 The best indicator of whether the defendant retained control sufficient to trigger the potential for liability under section 414 is the parties' contract. *Carney*, 2016 IL 118984, ¶ 41. "[T]he existence of a safety program, safety manual or safety director does not constitute retained control *per se*; the court must still conduct an analysis pursuant to the section 414 retained control exception." *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 318 (2004). The defendant's safety program must sufficiently affect the means and methods of the contractor's work to fall within the ambit of retained control. *Id.* at 318-19.

¶ 54 Under the contracts in this case, Power's safety program included employing Rainey as a safety director, a general safety manual, requiring each subcontractor to have competent supervision, and requiring each subcontractor to conduct weekly toolbox talks. However, the content of the respective toolbox talks was left to the subcontractor to determine.

¶ 55 Further, the contracts showed that each subcontractor was responsible for all labor, materials, tools, equipment, and supervision and to do all things necessary for the proper and complete performance of the work. "Subcontractor shall be and is fully responsible for protection and condition of its materials, Work or equipment installed or stored on Job Site or elsewhere until final acceptance thereof by Owner and Architect." The contracts and deposition testimony establish that Power reserved the general right to start, stop, and inspect the progress of the work, but each subcontractor had control over the means and methods of the work performance.

¶ 56 Here, plaintiff has not shown that Power exerted any control over his work performance. The evidence shows that Professionals was expected to check its measurements weekly. Nowlin testified that he called plaintiff and directed him to go the bed tower site on June 30, 2011, and check the benchmarks. Plaintiff arrived on the site shortly before 7 a.m. He was not required to check in with Power employees, and he did not speak to anyone that morning. He proceeded to the enclosed corridor to check the benchmarks. There was no evidence that Power had any knowledge of plaintiff's presence on the site or directed the manner in which he

performed his job. Plaintiff failed to establish that Power retained an amount of supervision such that plaintiff, a surveyor employed by a subcontractor, was not free to complete the work either in his own way or according to his employer's instructions. See *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 738 (2003).

¶ 57    In *Shaughnessy*, the plaintiff was employed as an ironworker by a sub-subcontractor. The plaintiff was injured on his first day on the job when he placed a wooden board over a gap in the floor and fell several feet when the board broke. *Id.* at 732. Plaintiff alleged claims of negligence under section 414 against the general contractor and the subcontractor that hired his employer. *Id.*

¶ 58    The reviewing court found that summary judgment was appropriate because the plaintiff failed to raise a question of fact as to whether the defendant exerted sufficient control over the plaintiff's employer. *Id.* at 737. The court concluded that the evidence established that the plaintiff's employer was "entirely free to perform the work in its own way" where the plaintiff's foreman "gave plaintiff all his work instructions." *Id.* at 740. "[N]o one from [either defendant] saw plaintiff engage in the unsafe practice that led to his injury or even had notice that plaintiff intended to engage in such conduct. Plaintiff, who was injured on his first day at the jobsite, admitted that he was only on the board for a 'fraction of a second' before the board broke and that only his coworker was in the area." *Id.* at 739-40. The court observed that "there was no evidence that [either defendant] knew or had notice of the hazardous method plaintiff employed to descend into the basement." *Id.* at 740.

¶ 59    The *Shaughnessy* court relied on the earlier decision in *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835 (1999), for support. In that case, the plaintiff was employed by the drywall subcontractor. He was injured when he stepped on braces in the scaffolding as he was attempting to hang drywall and one of the braces collapsed, causing him to fall. The plaintiff was instructed to stand on the braces by his employer. *Id.* at 837.

¶ 60    Under the contract with the general contractor, the plaintiff's employer "was to provide all labor, materials, tools, plant, equipment, competent full-time supervision and services, and 'do all things necessary for the proper performance, installation, construction and completion of all' " work. *Id.* at 836. The reviewing court found that the general contractor retained only a general right of supervision, "[i]t does not refer, directly or indirectly, to a right to direct the installation of drywall or the erection of the scaffold." *Id.* at 839.

> "There is no evidence to suggest Drywall [(the plaintiff's employer)] was not entirely free to perform the work in its own way. The evidence showed Brookhaven [(the general contractor)] never directed the 'operative details' of the work performed by Drywall and Rangel. Drywall, not Brookhaven, supplied the scaffold on which Rangel worked. A Drywall supervisor, not Brookhaven, directed Rangel to utilize the braces when necessary for positioning the drywall. This unsafe method of performing the work, which led to Rangel's injury, was proposed by Rangel's employer just hours before the accident. Here, as in *Bezan v. Chrysler Motors Corp.*, 263 Ill. App. 3d 858, 864 *** (1994), there is nothing to suggest that the general contractor 'knew or had notice of the hazardous method employed within this restrictive time period.' " *Id.*

¶ 61    Similarly, plaintiff has failed to raise a question of material fact that Power retained control over his work method. Plaintiff was directed to go to the bed tower site by his employer. He had no contact with Power's employees as to the manner in which he was to perform his job. The evidence in the instant case fails to establish that Power retained any control over

plaintiff's work method or had any knowledge of plaintiff's hazardous method used to check for the benchmarks in the corridor.

¶ 62    We also conclude that plaintiff has failed to raise a question of material fact that Power controlled Thorne's work. The crux of plaintiff's argument is that Meyer told Thorne employees to leave the leftover drywall in the corridor for future needs, and the drywall should be stored neat and should not block ingress and egress of the corridor. These instructions standing alone do not demonstrate control of the manner and means of Thorne's work by Power. As comment c to section 414 stated, suggestions and recommendations are not sufficient to establish control. Rather, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c, at 388 (1965). The record does not raise a question of fact that such a retention of a right of supervision existed. The basic instruction of where to store materials did not retain control over how Thorne chose to stack the drywall. Because no question of material fact exists as to whether Power retained sufficient control over its subcontractors' work methods, summary judgment was proper as to retained control under section 414 of the Restatement for both PCC and PCEC.

¶ 63    Next, we turn to plaintiff's claims against Thorne for negligence. Plaintiff has alleged that Thorne stored the drywall in an unsafe manner, such that it was improperly stacked without any means to secure it. Here, we need not reach the question of whether the drywall was improperly stacked because we find summary judgment was properly entered as a matter of law for the reasons that follow.

¶ 64    There are four factors to consider in a duty analysis: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Bruns*, 2014 IL 116998, ¶ 14. "A legal duty refers to a relationship between the defendant and the plaintiff such that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22. We find that plaintiff has not raised a question of material fact that Thorne owed him a duty because it was not reasonably foreseeable that he would move the drywall.

¶ 65    The Illinois Supreme Court "has long recognized that 'every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons.' " *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 19 (quoting *Widlowski v. Durkee Foods*, 138 Ill. 2d 369, 373 (1990)). "Thus, if a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury." (Emphasis omitted.) *Id.* "That something 'might conceivably occur,' does not make it foreseeable. [Citation.] Rather, something is foreseeable only if it is 'objectively reasonable to expect.' " *Bruns*, 2014 IL 116998, ¶ 33 (quoting *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 238 (2000)).

¶ 66    Here, plaintiff argues that it was reasonably foreseeable that an injury would have occurred from the manner in which the drywall was stacked. However, the admissible evidence in the record is unequivocal that tradespeople do not move the materials belonging to another entity. Deposition testimony from employees of Power, Thorne, and Professionals definitively established that it was a known custom not to move materials of another subcontractor.

- 14 -

¶ 67        Plaintiff, himself, admitted that it was Professionals' policy that when materials obstructed benchmarks the surveyor was to contact the general contractor to arrange for the materials to be moved. Nowlin, plaintiff's supervisor, and Murtha, another Professionals employee, confirmed this policy. Both Nowlin and Murtha testified that if the obstructed benchmark is unable to be cleared after contacting the general contractor, then the surveyor should record the benchmark as "blocked" in his notes and return on a later date. No disciplinary action would be taken if a benchmark was listed as "blocked." Further, plaintiff admits that the benchmark was not behind the stacked drywall. Plaintiff also admits that the location of the benchmark was recorded in his notebook, which he left in his vehicle and did not use to determine the benchmark's location. He assumed that the benchmark was behind the drywall based on his own recollection but was in error. Plaintiff further admitted in his deposition that the drywall would not have moved if he had not moved it. In his many years as a surveyor, plaintiff had never moved drywall prior to the accident. There was no reason for plaintiff to have moved the drywall.

¶ 68        Moreover, even if we consider the affidavit from plaintiff's expert Hislop, Hislop does not refute the custom and practice of not moving drywall. Hislop's general statement, which we consider the propriety of striking later in this decision, was that it was "custom and practice" to move another contractor's "tools and materials" unless specifically restricted. Hislop referenced borrowing ladders and scaffolds but never stated it was a common practice to move another contractor's drywall. The testimony from the employees of all contactors on the site established that it was not a custom and practice to move another contractor's materials at the bed tower site.

¶ 69        Given the unrefuted testimony, including from plaintiff himself and other Professionals employees, that it is customary for a tradesperson not to move materials belonging to another contractor, as well as plaintiff's admission that the benchmark was not obstructed by the drywall, it was not "objectively reasonable" for Thorne to foresee that plaintiff would attempt to move the stacked drywall. Since the drywall did not impede plaintiff's ability to perform his work, it was not foreseeable that plaintiff would engage with the drywall to any extent. Absent a reasonably foreseeable risk of injury, no duty on the part of Thorne can exist as a matter of law. The lack of any duty forecloses plaintiff's negligence allegations. Accordingly, summary judgment was properly granted in favor of Thorne.

¶ 70        Plaintiff additionally contends that all defendants are liable for premises liability under section 343 of the Restatement. Section 343 states:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts § 343 (1965).

¶ 71        Under section 343, while "a possessor of land, including a general contractor, owes its invitees a common law duty of reasonable care to maintain its premises in a reasonably safe condition [citation], it is axiomatic that no legal duty arises unless the harm is reasonably

foreseeable [citation]." *Clifford v. Wharton Business Group, L.L.C.*, 353 Ill. App. 3d 34, 42 (2004). Even if we were to presume both that the stacked drywall was a condition on the land and it constituted a dangerous condition, we find that plaintiff has not raised a question of material fact under premises liability because the danger of stacked drywall was open and obvious. We have already concluded that it was not objectively reasonable to foresee that plaintiff would move the drywall because of the policy not to move other entities' materials and that plaintiff's benchmark was not obstructed by the drywall.

¶ 72    Under the open and obvious rule, " 'a party who owns or controls land is not required to foresee and protect against an injury if the potentially dangerous condition is open and obvious.' " *Bruns*, 2014 IL 116998, ¶ 16 (quoting *Rexroad v. City of Springfield*, 207 Ill. 2d 33, 44 (2003)). "The open and obvious rule is also reflected in section 343A of the Restatement (Second) of Torts, which this court has adopted." *Id.* "Under section 343A, a 'possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them.' " *Id.* (quoting Restatement (Second) of Torts § 343A, at 218 (1965)). " 'Obvious' means that 'both the condition and the risk are apparent to and would be recognized by a reasonable [person], in the position of the visitor, exercising ordinary perception, intelligence, and judgment.' " *Id.* (quoting Restatement (Second) of Torts § 343A cmt. b, at 219 (1965)).

¶ 73    "Whether a dangerous condition is open and obvious may present a question of fact," but "where no dispute exists as to the physical nature of the condition, whether the dangerous condition is open and obvious is a question of law." *Id.* ¶ 18. However, "[t]he existence of an open and obvious danger is not an automatic or *per se* bar to the finding of a legal duty on the part of a defendant." *Id.* ¶ 19. To determine whether a duty exists, a court must still consider the four factors of the duty analysis under the facts of the case at bar. *Id.* "Application of the open and obvious rule affects the first two factors of the duty analysis: the foreseeability of injury, and the likelihood of injury." *Id.* "Where the condition is open and obvious, the foreseeability of harm and the likelihood of injury will be slight, thus weighing against the imposition of a duty." *Id.*

¶ 74    Plaintiff contends that the "deliberate encounter" exception to the open and obvious rule is applicable here. We disagree. "The deliberate encounter exception applies ' "where the possessor [of land] has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable [person] in his position the advantages of doing so would outweigh the apparent risk." ' " *Id.* ¶ 20 (quoting *Sollami v. Eaton*, 201 Ill. 2d 1, 15 (2002), quoting Restatement (Second) of Torts § 343A cmt. f, at 220 (1965)). "Where an exception to the open and obvious rule applies, the outcome of the duty analysis with respect to the first two factors is 'reversed.' " *Id.* (quoting *Belluomini v. Stratford Green Condominium Ass'n*, 346 Ill. App. 3d 687, 692 (2004)).

¶ 75    Plaintiff argues that he was "encountering the enclosed hallway for the first time in his search for the benchmarks," was trying to "peer behind the drywall, and was not paying attention to how vertically it was stacked." While it is accurate that this was the first time plaintiff had to check the benchmarks since the hallway was enclosed, it was not reasonable that he would proceed to "encounter" the drywall when his benchmarks were not obstructed by it. As previously discussed, his ability to complete his task at the site did not require him to move the drywall. Moreover, none of the testimony in the record supports plaintiff's position that it was reasonable for him to encounter the drywall. See *Kotecki*, 333 Ill. App. 3d at 591

(finding that the plaintiff "offered no evidence or argument that he made a reasonable decision to deliberately encounter an obvious danger"). The testimony from employees of Power, Thorne, and Professionals, and plaintiff himself, consistently established that it was not a practice in the industry to move another contractor's materials. Further, plaintiff's expert did not testify that moving another contractor's drywall was customary or even appropriate. He never addressed drywall at all. Accordingly, plaintiff has not raised a question of material fact to preclude a finding that even if the drywall constituted an open and obvious condition, a reasonable person would have proceeded to encounter that known or obvious condition. Therefore, summary judgment was proper.

¶ 76 We next consider plaintiff's argument that the trial court erred in quashing the deposition of PCC's president, Jeff Karp. On September 25, 2013, the trial court entered an order closing discovery as to additional depositions, allowing plaintiff to depose witnesses noticed for deposition as of that date. On October 30, 2013, plaintiff issued a notice for deposition for Karp, the president of PCC. Subsequently, PCC filed a motion to quash the deposition, arguing that the notice violates the court's order and Karp was never at the bed tower site and could not offer any testimony regarding the incident. PCC pointed out that plaintiff had previously deposed nine Power employees during discovery. Plaintiff responded that Karp was the person who negotiated the contracts and could interpret its terms. PCC offered to stipulate the contracts' authenticity and that the contracts speak for themselves. The trial court granted PCC's motion.

¶ 77 "The trial court has freedom to determine the scope of discovery, and, as a reviewing court, we will not disturb the trial court's decision absent an abuse of discretion." *Storino, Ramello & Durkin v. Rackow*, 2015 IL App (1st) 142961, ¶ 40. Plaintiff maintains that Karp's deposition was relevant to explain changes made to the contract language via strikeouts and added language in the agreement with St. Alexius as well as Power's obligations under the contract regarding safety procedures. Plaintiff has offered no explanation why the notice was filed more than a month after the court ordered that no additional depositions would be allowed. We find no abuse of discretion. The trial court allowed extensive discovery, including numerous depositions of Power, Thorne, and Professionals employees. All of the parties' contracts were disclosed and submitted. Under the four corners rule of contract interpretation, " '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). PCC did not dispute the authenticity of the contracts, nor has plaintiff pointed to any specific provisions he found ambiguous as it related to his negligence action. Accordingly, the trial court did not abuse its discretion in quashing plaintiff's notice of deposition.

¶ 78 Finally, plaintiff contends that the trial court erred in striking portions of his affidavit and Hislop's affidavit. The sufficiency of an affidavit in support of a motion for summary judgment is determined under Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013). The rule states that affidavits:

> "shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant

relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." *Id.*

¶ 79    Because affidavits submitted in the summary judgment context serve as a substitute for testimony at trial, affidavits must strictly comply with Rule 191(a) to ensure that trial judges are presented with valid evidentiary facts on which to base a decision. *Robidoux*, 201 Ill. 2d at 335-36. "In general, this court reviews a circuit court's decision on a motion to strike an affidavit for an abuse of discretion, but when the motion 'was made in conjunction with the court's ruling on a motion for summary judgment,' we employ a *de novo* standard of review with respect to the motion to strike." *US Bank, National Ass'n v. Avdic*, 2014 IL App (1st) 121759, ¶ 18 (quoting *Jackson v. Graham*, 323 Ill. App. 3d 766, 773 (2001)).

¶ 80    The trial court struck plaintiff's affidavit filed in response to PCEC's motion for summary judgment because it contradicted statements made in his deposition. In his deposition, plaintiff admitted that Professionals' policy required him to ask for assistance from a contractor whose material blocked his work. He testified that he customarily asked for assistance in removing an obstruction and previously had never handled drywall sheets or attempted to move drywall sheets. Plaintiff admitted that he knew that he had the right and authority to ask for assistance to move items in order visualize a benchmark. In his affidavit, plaintiff stated that he had never been advised of a policy not to move other trades' equipment or supplies and described jobsites in which he previously had moved materials belonging to other entities.

¶ 81    " 'A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge.' " *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 671 (1992) (quoting *Hansen v. Ruby Construction Co.*, 155 Ill. App. 3d 475, 480 (1987)). "Although statements made during a discovery deposition are normally treated only as evidentiary admissions, which may be contradicted, such statements may be 'so deliberate, detailed, and unequivocal, as to matters with the party's personal knowledge' that the statements will be held to be judicial admissions." *Id.* (quoting *Lindenmier v. City of Rockford*, 156 Ill. App. 3d 76, 87 (1987)). A party may not contradict a judicial admission either with his own contrary testimony or that of other occurrence witnesses or experts. *Id.* To the extent that plaintiff's affidavit contradicted his prior testimony, the trial court did not err in striking those portions of the affidavit.

¶ 82    We now turn to Hislop's affidavit. The trial court struck portions of Hislop's amended affidavit. Specifically, the court struck the statements regarding (1) the industry standard does not require asking to move another's materials as conclusory and lacking a basis for his opinion, (2) the force to pull the drywall because Hislop did not discuss his calculations or methods in reaching his conclusion or provide any foundation for his opinion, and (3) Hislop's opinion that the drywall was stacked in a dangerous manner because it was conclusory and did not rely on admissible facts.

¶ 83    "Rule 191(a), however, does not bar legal conclusions *per se*." *Cain v. Joe Contarino, Inc.*, 2014 IL App (2d) 130482, ¶ 62. "Rather, the rule simply bars any conclusion, legal or otherwise, for which the affiant provides no specific factual support." *Id.* " '[W]hile an expert witness at trial may give opinion testimony without disclosing the facts underlying his opinion [citations], the same is not true of affidavits submitted in summary judgment proceedings.' " *Perona v. Volkswagen of America, Inc.*, 2014 IL App (1st) 130748, ¶ 51 (quoting *Woolums v. Huss*, 323 Ill. App. 3d 628, 636 (2001)). " 'Affidavits in opposition to motions for summary

judgment must consist of facts admissible in evidence as opposed to conclusions and conclusory matters may not be considered in opposition to motions for summary judgment.' " *Id.* (quoting *Woolums*, 323 Ill. App. 3d at 636). "Additionally, '[a]n expert's opinion is only as valid as the reasons for the opinion.' " *Id.* (quoting *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 400 (2007)).

¶ 84    The first portion of Hislop's affidavit struck by the trial court was the added paragraph of the amended affidavit stating that

> "it was a custom and practice in the construction industry that unless specifically restricted contractors will regularly not only move other contractors' tools and materials, they will borrow ladders, Baker scaffolds and other materials. Contractors will regularly move material that is in their way in order to perform their job. Even if specifically restricted, unless the general contractor regular enforces the restriction, contracts will borrow ladders and other materials to perform their job."

¶ 85    The trial court properly struck this paragraph of the affidavit as it is conclusory and offers no facts or support for his conclusions. As an affidavit in summary judgment proceedings, Hislop cannot state his opinion without providing the basis for the opinion. See *id.*

¶ 86    Next, the court struck portions in which Hislop discussed the force necessary to move the drywall. He stated that,

> "[o]nly 7 to 14 pounds of effort is required to pull a single piece of drywall, 4 feet wide and 8 feet long that weighs 80 pounds, away from the wall, which is placed 4 to 8 inches away from the wall at the floor. When an unsuspecting individual pulls sheetrock [away] from a wall, before they know it, they then have to restrain an accumulating vector force as the sheetrock is tipped past 'vertical.' This load increases until the individual has to contend with the entire accumulated weight of the sheetrock. *** The fourteen (14) sheets that Mr. Snow pulled away from the wall in his matter weighed approximately 1040 pounds. To have pulled the 14 sheets of the sheetrock, the edges of which were spaced 4 to 8 inches away from the wall, would have required 87 to 173 pounds of force. That is a substantial effort, not the casual effort Mr. Snow indicated he exerted. The deponents in this matter were unable to define the distance from the wall they set the edge of their sheetrock. Had the sheetrock been set in a position that was more vertical than recommended by the Gypsum Institute, even less effort would have been required to pull over the stack of sheetrock."

¶ 87    The trial court struck this portion of the affidavit because Hislop failed to disclose how he calculated the force required to move the drywall or his methods in reaching his conclusion, nor did he provide any foundation for his opinion. We agree. Again, an expert's affidavit in summary judgment proceedings must be supported by a factual basis. No such basis was provided on how the force calculations were reached, and accordingly, the court properly struck this portion of his affidavit.

¶ 88    Finally, the trial court struck Hislop's opinion as to whether the drywall was stacked in a dangerous manner as conclusory and without reliance on admissible facts. As previously discussed, Hislop included an OSHA regulation and several portions from different gypsum handbooks in his affidavit. Hislop then stated that "tilting sheetrock against a wall does not comply with OSHA regulations or the recommendation of the US Gypsum Association." However, as noted above, the cited OSHA regulation is silent about vertical stacking and instructs for materials to be stacked to prevent sliding, falling, or collapse. Likewise, the

- 19 -

handbook guidelines provided instructions on how to properly stack drywall sheets vertically. Hislop then stated, "[t]he hazard of sheetrock stacked on edge has been recognized throughout the world to extent that the construction industry is suggesting that edge stacked boards should be labeled with 'Caution' signs." Hislop offered no foundation for his opinion that this has been "recognized throughout the world." His support is a portion from the 2009 handbook with instructions on how to vertically stack drywall and that warning tape should be used. Hislop further stated "[t]he hazard of propping sheetrock against walls has been well established in the drywall industry." He offered no admissible facts to support his statement. Hislop also referenced "statistics in sheetrock injury cases reflect that it is not drywall installers who get crushed and injured by sheetrock stacked on edge, but individuals who do not regularly work with the product and are not aware of the inherent safety hazard." Hislop provided no foundation for this conclusory statement.

¶ 89     After reviewing these portions of the affidavit, we find the statements were in violation of Rule 191, and the trial court properly struck them as conclusory and lacking in foundation and factual support.

¶ 90     Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 91     Affirmed.