2024 IL App (1st) 240271

SECOND DIVISION
December 17, 2024

No. 1-24-0271

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| WAYNE WIBERG, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19 L 1296 |
| | ) | |
| METRO STORAGE, LLC and METRO STORAGE | ) | Honorable |
| NAPERVILLE, LLC, and DUPAGE TOPSOIL, INC., | ) | Anthony C. Swanagan and |
| | ) | Michael F. Otto, |
| Defendants | ) | Judges Presiding. |
| | ) | |
| (Metro Storage, LLC, Defendant-Appellee). | ) | |

PRESIDING JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Justices McBride and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     Metro Storage Naperville, LLC, the project owner, contracted with Metro Storage, LLC

(Metro), a separate entity serving as the general contractor, to build four single-story self-storage

buildings and an office. Metro subcontracted the excavation work to Du Page TopSoil, Inc., and

the concrete work to Brandonisio & Company (B&C). Plaintiff Wayne Wiberg, a carpenter

employed with B&C, sustained injuries while working at the job site. Wiberg sued Metro Storage

Naperville, Inc., Metro, and Du Page TopSoil, Inc. Eventually, all three defendants moved for summary judgment. The circuit court granted Metro's motion for summary judgment.[1] On appeal, Wiberg challenges that ruling. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3                                    A. Complaint

¶ 4    Wiberg's first amended complaint alleged that, on July 17, 2018, he was working in a trench at the job site to lay the foundation floor and walls of the first floor. Wiberg entered and exited the trench using a six-inch piece of concrete protruding from a soil embankment in the trench. Though there were two access ramps into the trench nearby, Wiberg did not use them because, according to him, Metro insisted on the speedy completion of the project. On one trip back into the trench, Wiberg was carrying a 50-pound steel ply while entering the trench, and the concrete piece he stepped on gave out, causing him to fall and sustain injuries.

¶ 5    Wiberg alleged two counts against Metro: construction negligence and premises liability. As to the construction negligence count, Wiberg alleged that Metro was careless and negligent in various ways, including (1) failing to inspect the premises and work being done; (2) improperly operating, managing, maintaining, and controlling the premises; (3) failing to provide Wiberg with a safe workplace; (4) failing to warn Wiberg about the dangerous conditions at the job site; and (5) failing to provide adequate safeguards to protect Wiberg from injury. In support of the premises liability count, he alleged that Metro was negligent in that it failed to (1) properly inspect the job site and maintain it in a safe manner; (2) warn any business invitee, such as Wiberg, of the

---

[1]Wiberg settled with Metro Storage Naperville, LLC and Du Page TopSoil, Inc., and the court dismissed those parties from the suit.

unreasonably dangerous conditions; (3) clear the protruding concrete and other debris from the job site; and (4) properly plan, schedule, and coordinate the work.

¶ 6                              B. Metro's Motion for Summary Judgment

¶ 7     Metro moved for summary judgment, arguing that it did not owe Wiberg a duty of care as a matter of law. Metro contended that (1) it did not retain sufficient control over the operative details of Wiberg's work to impose liability under section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)), (2) Wiberg did not adduce evidence to demonstrate Metro had notice of the unsafe work practice, (3) the protruding concrete constituted an open and obvious condition, and (4) the traditional factors in a duty analysis weighed against the imposition of a duty in this case.

¶ 8     In response, Wiberg argued that Metro owed him a reasonable duty of care under a premises liability theory because it controlled the premises at the time of the injury and it created the condition that caused his injury. Wiberg also argued that Metro owed him a duty of reasonable care under section 414 of the Restatement (Second) of Torts because Metro retained control over the operative details of Wiberg's work.

¶ 9     In their summary judgment briefing, the parties relied on contract terms, an expert report, and deposition testimony. We discuss these in turn below.

¶ 10                                 1. Contract Terms

¶ 11                         *Metro Storage Naperville and Metro*

¶ 12    Metro Storage Naperville (the project owner) and Metro (the general contractor) entered into a standard form agreement often used by project owners and general contractors in the construction industry. That agreement incorporated another standard agreement that set forth general contractor rights and duties. Section 3.3.1 of the incorporated agreement provided:

3

"The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the Contract unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences and procedures, the Contractor shall evaluate the job site safety thereof and, except as stated below, shall be fully and solely responsible for job site safety of such means, methods, techniques, sequences and procedures."

¶ 13    Section 3.3.2 provided:

"The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the work for, and on behalf of, the Contractor or any of its Subcontractors."

¶ 14    Section 2.3.2.1 of the agreement also allowed Metro to delegate its work to subcontractors:

"Those portions of the Work that the Construction Manager does not customarily perform with the Construction Manager's own personnel shall be performed under subcontracts or by other appropriate agreements with the Construction Manager."

¶ 15    Finally, section 11.4 dealt with assignment:

"The Owner and construction manager, respectively, bind themselves, their agents, successors, assigns and legal representatives to this agreement. *** Except as provided in Section 13.2.2 ***, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment

4

without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract."

¶ 16                                     *Metro and B&C*

¶ 17    Metro also entered into a contract for concrete work with B&C, a subcontractor and Wiberg's employer. Section 1.1 of that agreement incorporated the contract between Metro Storage Naperville and Metro. Section 1.3 provided that the subcontractor was responsible for all labor, materials, and equipment. Section 1.4 read, in part, "the Subcontractor shall assume toward the Contractor all obligations and responsibilities which the Contractor, under such documents, assumes toward the Owner." Section 1.7 provided that the subcontractor would supervise its own work. Section 1.9 required the subcontractor to comply with all laws, including Occupational Safety and Health Administration (OSHA) regulations. Section 4.2 allowed the general contractor to order changes to the work as long as the changes were still within the general scope of the work. Section 5.1 required the subcontractor to purchase and maintain insurance coverage. Under section 5.6, the subcontractor agreed to indemnify the general contractor from any claims and damages arising from the subcontractor's work. Section 6.1 required the subcontractor to keep the premises free from waste and debris caused by its operations. Section 6.8 gave the general contractor and project owner the authority to reject work that did not conform to the project plans.

¶ 18                         2. Wayne Wiberg's Retained Expert

¶ 19    Wiberg retained David Soderman, a construction industry consultant. Soderman opined that Metro acted as a "controlling employer" under OSHA standards because Metro controlled the job site and directed the subcontractors to complete their work according to the project plans and specifications. According to Soderman, Metro's active daily control of the job site was consistent with practice and custom in the industry. Soderman further opined that Metro was both a "creating"

5

and "correcting" employer under OSHA standards, meaning that it had responsibility to correct any hazards it caused on the job site. He also opined that Metro failed to maintain a safe job site by not observing or correcting the poorly excavated area that included the protruding concrete that Wiberg stepped on when he was injured. Soderman also found that, although ramps were available to enter and exit the trench, their existence did not preclude Wiberg from using the sides of the trench for entry and exit. Soderman concluded that Metro, as the controlling, creating, and correcting employer under OSHA standards, failed to keep the job site safe, thereby causing the hazardous condition that led to Wiberg's injuries.

¶ 20                                    3. Deposition Testimony

¶ 21                                    *Wayne Wiberg*

¶ 22    Plaintiff Wayne Wiberg, an employee of B&C, testified that, on the day of his injury, he entered and exited the trench using a six-inch piece of precast concrete that protruded from the side of the trench. The piece of concrete was "approximately 16 inches long by four inches wide and probably six inches sticking out, straight out the side, so it was just like a step." Wiberg entered and exited the trench as he was building what would eventually be the foundation floor and walls of the first floor of the structure. On one trip back into the trench, he was carrying a 50-pound steel form, and upon stepping on the six-inch concrete piece, it came loose from the soil causing him to fall on concrete and sustain injuries. Wiberg acknowledged that an alternative path into the trench did exist (using ramps) but would have required him to walk an extra 200 feet, and he would "never get anything done" if he used that path. Prior to this incident, he had slipped on loose stone that was "on the edges all over the place." He also stated that there was debris and precast concrete all over the job site.

¶ 23    Wiberg testified that, because of the amount of precast concrete on the job site, he was unable to use a sledgehammer to secure a stake in the ground; rather, he had to use a large hammer drill to drill into the ground to make holes for stakes. Wiberg spoke to the general contractor, who told him he just had to deal with it. He also testified that the general contractor ordered a revision on one of the buildings. Wiberg took directions from Vincent Brandonisio (the superintendent of B&C), used B&C's tools, and received no "safety training or anything like that" from Metro.

¶ 24                                    *Timothy Mills*

¶ 25    Timothy Mills was Metro's site superintendent. He hired B&C. Mills testified that he was responsible for a "certain degree" of site safety "but each contractor [was] responsible for their own safety, their [personal protective equipment], using best practices and safety practices within their own crews to ensure no one gets hurt." He conducted visual inspections and spoke to foremen to confirm that workers wore hard hats and other personal protective equipment. Mills walked the site daily and had site-wide responsibility to understand what was going on at any given time. Mills had the authority to remove any subcontractor who did not follow safety protocol. If he saw that the subcontractors' work created fall or tripping hazards, he would direct the subcontractors to rectify the hazards, and he expected that subcontractors would follow his directions. Mills testified that he and Metro were committed to providing a safe work environment for everyone by looking for unsafe acts or conditions at the site daily.

¶ 26                                    *Christopher Arnold*

¶ 27    Christopher Arnold was Metro's director of construction. He testified that he ordered a subcontractor to redo siding on a couple of buildings and the subcontractor did so. When Metro's superintendent, Mills, identified a safety violation to a subcontractor, the subcontractor had an obligation to comply with safety standards. Metro was responsible for ensuring that materials were

stored and managed properly and for creating and maintaining a safe work environment. Metro reviewed and inspected subcontractors' work and could stop work and order it redone.

¶ 28                                          *Vincent Brandonisio*

¶ 29    Vincent Brandonisio, B&C's superintendent, testified that he worked as a foreman at the job site on a daily basis until he appointed Wiberg as foreman about two weeks before the injury. Brandonisio still came to the job site each morning. Brandonisio instructed his employees on how to complete the concrete work. He directed Wiberg to stay in the trench while the laborers brought him the concrete forms. Brandonisio stated that B&C provided its own equipment, forms, and tools to do the concrete work. Metro did not direct Wiberg or any other employee on how to move or install concrete forms or footings. That is, he averred that Metro did not control the means and methods of how B&C and Wiberg performed their concrete work.

¶ 30                                          *William Barry*

¶ 31    William Barry, a carpenter with B&C, testified that he took directions only from Brandonisio and Wiberg and used B&C's tools. On the day of the injury, Barry was approximately 20 feet from Wiberg at the time Wiberg fell. Barry heard a scream, turned around, and found Wiberg lying in the trench about three feet away from an access ramp. Barry had witnessed Wiberg use the ramps other times. A safer way to bring forms into the trench is by setting them down along the bank of the trench, sliding into the trench, and then picking up the form. However, he also stated that it was the laborers' job, and not Wiberg's, to bring forms to the trenches. He emphasized that he had over 30 years' experience as a carpenter and had never seen anyone enter a trench in the manner that Wiberg did.

¶ 32                                          *Joseph Kliem*

¶ 33    Joseph Kliem was the vice president of Du Page TopSoil (DTS), another subcontractor Metro hired. Metro hired DTS to excavate the trenches and create access ramps into the trenches. Kliem testified that DTS provided its own equipment, decided how to perform the excavation work, and did not expect Metro to monitor DTS employees' work. DTS was responsible for removing waste and debris it dug up during the excavation process. Brandonisio approved DTS's excavation work as to the trenches and access ramps.

¶ 34                    C. The Circuit Court's Decision

¶ 35    The circuit court granted Metro's motion for summary judgment on both counts of Wiberg's first amended complaint. The court did not find any evidence in the record "that anybody [other than B&C] managed the details of [B&C's] concrete work to the extent that would expose them to liability." The court reasoned that Metro's general contractual rights to oversee safety and to stop work, to reject work as dissatisfactory, and to have safety meetings did not amount to Metro controlling the "operative details" of Wiberg's work, as required under the theory of retained control to impose duty. Additionally, the court held that the protruding concrete constituted an "open and obvious" condition. Wiberg appeals those two holdings.

¶ 36                            II. ANALYSIS

¶ 37    On appeal, Wiberg argues that the circuit court erroneously granted Metro's motion for summary judgment because (1) an issue of material fact exists regarding whether Metro retained sufficient control over the job site to impose liability for Wiberg's injuries under a construction negligence theory and (2) the open and obvious rule did not apply and therefore Metro was liable under a premises liability theory. Metro responds, arguing that the circuit court's ruling was correct and it owed Wiberg no duty of care as a matter of law.

¶ 38                            A. Jurisdiction

¶ 39    Before reaching the substantive issues on appeal, we address jurisdiction. In his notice of appeal, Wiberg listed only the January 18, 2024, order denying his motion to reconsider the circuit court's summary judgment ruling. Wiberg did not list the September 29, 2023, order granting summary judgment in Metro's favor, which is actually the order he challenges in this appeal. Metro contends that Wiberg's failure to list the September 29, 2023, order deprives us of jurisdiction to review the circuit court's summary judgment ruling. We disagree.

¶ 40    Recently, our supreme court reaffirmed the principle that "notices of appeal are to be liberally construed and that they confer jurisdiction even if the order was not expressly mentioned in the notice of appeal, if that order was a step in the procedural progression leading to the judgment which was specified in the notice of appeal." (Internal quotation marks omitted.) *In re Marriage of Arjmand*, 2024 IL 129155, ¶ 27. In his notice of appeal, Wiberg identified the order denying his motion to reconsider the circuit court's prior order granting Metro's motion for summary judgment. The order granting summary judgment in favor of Metro was clearly in the procedural progression to the order denying the motion to reconsider that very summary judgment ruling. Accordingly, we have jurisdiction to consider Wiberg's challenge to the summary judgment order the court issued on September 29, 2023. We turn to the merits of the appeal.

¶ 41                                    B. Legal Standards

¶ 42    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "Where a reasonable

person could draw divergent inferences from undisputed facts, summary judgment should be denied." *Parkside Senior Services, LLC v. National Development and Consultants, Ltd.*, 303 Ill. App. 3d 1022, 1024 (1999). We review a circuit court's summary judgment decision *de novo*. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). We review questions of law, such as the existence of a duty, under the same standard. *Vancura v. Katris*, 238 Ill. 2d 352, 383 (2010). *De novo* review means we engage in the same analysis as the circuit court. *Xuedong Pan v. King*, 2022 IL App (1st) 211482, ¶ 16.

¶ 43    Wiberg's suit is based on negligence. "In any action for negligence, the plaintiff must present sufficient evidence to establish the defendant owed a duty to the plaintiff." *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 837 (1999). We decide the question of whether a duty exists as a matter of law; if there is no duty, there can be no recovery. *Id.* at 837-38. Wiberg argues that the court erred in holding that (1) Metro did not owe him a duty under the theory of retained control and (2) the open and obvious rule applied.

¶ 44                                C. Duty under Retained Control

¶ 45    Wiberg's first theory of liability is essentially that, because Metro retained a great deal of control over his work, it is liable for his injuries. Typically, a general contractor that hires a subcontractor is not liable for the subcontractor's torts. *LePretre v. Lend Lease (US) Construction, Inc.*, 2017 IL App (1st) 162320, ¶ 26 (citing *Madden v. F.H. Paschen/S.N. Nielson, Inc.*, 395 Ill. App. 3d 362, 381 (2009)). That is because the general contractor usually does not have control over the details and methods of the subcontractor's work, so the general contractor is not in a good position to prevent the subcontractor's negligence. *Id.* However, as section 414 of the Restatement (Second) of Torts explains, where the general contractor *does* retain sufficient control over the subcontractor, the general contractor may be held liable for the subcontractor's torts:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).[2]

¶ 46    In other words, the general rule against the imposition of liability does not apply where a general contractor exercises sufficient control over a subcontractor. Comments a and c to section 414 provide guidance as to what level of control is necessary to impose liability on a general contractor:

"a. If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.

***

---

[2]Illinois implicitly adopted the substantively identical section 414 from the Restatement of Torts (1934), in *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325 (1965). Appellate court decisions have repeatedly relied on section 414 in their analyses in construction negligence cases. The parties do not dispute the applicability of section 414.

c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmts. a, c (1965).

¶ 47    The mere existence of a safety program, safety manual, or safety director is insufficient to trigger a duty of care under section 414. *Fonseca v. Clark Construction Group, LLC*, 2014 IL App (1st) 130308, ¶ 28. Even if a general contractor retains the right to inspect work, orders changes to the plans, and ensures that safety precautions are observed and the work is done safely, the general contractor is not liable for a subcontractor's negligence unless the evidence shows that the general contractor "retained control over the incidental aspects of the [subcontractor's] work." *Id.*; *Bieruta v. Klein Creek Corp.*, 331 Ill. App. 3d 269, 278 (2002). Where the general contractor controls the project ends and the subcontractor controls the means of reaching the project ends, there is no retained control. See *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916, 924 (1994); see also *Rogers v. West Construction Co.*, 252 Ill. App. 3d 103, 109 (1993) (finding no liability under section 414 where a general contractor was primarily focused on checking daily progress, not supervising the manner in which work was done).

¶ 48    The issue of retained control is typically a question of fact. *Neisendorf v. Abbey Paving & Sealcoating Co.*, 2024 IL App (2d) 230209, ¶ 70 (citing *Bokodi v. Foster Wheeler Robbins, Inc.*,

312 Ill. App. 3d 1051, 1059 (2000)). However, we may decide the issue of a general contractor's retained control as a matter of law where the evidence is insufficient to create a factual question. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 41.

¶ 49                                 1. Control Based on Contract

¶ 50    The best indicator of whether a general contractor retained control sufficient to impose a duty under section 414 is the contract between the general contractor and subcontractor. *Id.* ¶ 41. The interpretation of a contract is a question of law and may be decided on a motion for summary judgment. *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 36.

¶ 51                    *Contract Between Metro Storage Naperville and Metro*

¶ 52    Wiberg relies primarily on the contract between Metro Storage Naperville (the project owner) and Metro, rather than the best indicator of control, which would be the contract between Metro and B&C (the subcontractor). See *Carney*, 2016 IL 118984, ¶ 41. But, because Wiberg raises the contract between Metro Storage Naperville and Metro, we examine its language to determine whether Metro retained sufficient control over Wiberg's work such that it owed him a duty of care.

¶ 53    Section 3.3.1 of the contract between Metro Storage Naperville and Metro provides that "[Metro] shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the Contract." This court has declined to impose a duty based on identical language. For example, in *LePretre*, 2017 IL App (1st) 162320, ¶ 3, a subcontractor's employee sustained injuries on a job site, and he sued the general contractor. The contract between the project owner and the general contractor stated: " 'The Contractor [Lend Lease] shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures and for coordinating all

portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters ***.' " *Id.* ¶ 6. This court held that this language was insufficient to demonstrate the requisite control; it was merely "part of the general rights reserved to someone, like [the general contractor], who employs a [sub]contractor, rather than evidence that [the general contractor] retained control over the manner in which work by [the subcontractor] was performed." *Id.* ¶ 32. We agree with this reasoning and apply it to the identical contractual language in this case.

¶ 54    Similarly, in *Snow v. Power Construction Co.*, 2017 IL App (1st) 151226, ¶ 1, we considered whether a general contractor could be held liable for a subcontractor's injuries sustained when drywall fell on him at the construction site. The contract between the project owner and general contractor in that case contained the same section 3.3.1 language as in this case. *Id.* ¶ 9. This court found that this contract language did not indicate retained control. *Id.* ¶¶ 54-55.

¶ 55    *LePretre* and *Snow* both involved identical contract language (section 3.3.1) between the project owner and general contractor. Neither of the cases found the section 3.3.1 language dispositive of the general contractor's retained control over the subcontractor. We agree with these decisions and hold that the same contract language at issue here also does not indicate that Metro retained control over Wiberg.

¶ 56                    *Contract Between Metro and B&C*

¶ 57    As explained above, the best indicator of control is the contract between the general contractor and subcontractor. *Carney*, 2016 IL 118984, ¶ 41. Here, the contract between Metro and B&C provides that B&C was responsible for all labor, materials, and equipment; supervising its employees' work; complying with all laws, including OSHA regulations; purchasing and maintaining insurance coverage; and keeping the premises free from waste and debris caused by

its operations. These provisions indicate that B&C, not Metro, retained control over Wiberg's work. While the contract did allow Metro to reject work and order revisions, that does not establish retained control on Metro's part. A general right to order work stopped or resumed, or to order changes, does not indicate control. Restatement (Second) of Torts § 414 cmt. c (1965); see also *Neisendorf*, 2024 IL App (2d) 230209, ¶ 87 ("We reject plaintiff's argument that the fact that [the general contractor] could stop work was itself sufficient evidence of control under section 414 of the Restatement."); *LePretre*, 2017 IL App (1st) 162320, ¶ 46 (finding that the general contractor's on-site presence and authority to reject work did not indicate retained control).

¶ 58    Neither of the contracts at issue supports a finding that Metro retained control over Wiberg's work such that it owed him a duty of care.

¶ 59                    2. Control Based on Conduct

¶ 60    We now consider whether there is a genuine issue of material fact as to whether the parties' conduct establishes that Metro retained control over Wiberg's work such that it owed him a duty of care.

¶ 61    In *Snow*, although the contract terms gave the general contractor control over various aspects of the work, the court held that the general contractor had not actually exerted control over the subcontractor's work. *Snow*, 2017 IL App (1st) 151226, ¶ 56. The court focused less on the contract language and more on the conduct of both the general contractor and subcontractor and found their conduct insufficient to rise to the level of control contemplated by section 414. *Id.* Specifically, the court noted that the subcontractor arrived at the job site; did not check in with, or speak to, anyone; and did the work himself without the general contractor's knowledge that he was even there. *Id.* In other words, he completed work himself, in his own way, and without the general contractor's instruction or supervision. *Id.*

¶ 62    *Fonseca* provides additional guidance as to conduct. See *Fonseca*, 2014 IL App (1st) 130308, ¶ 29. In that case, the subcontractor supervised its employees and cleaned up its debris. *Id.* The general contractor walked around the job site to ensure people were working safely but did not stop any work. *Id.* The subcontractor testified to "controll[ing] the means and methods of its own work during construction of the building." (Emphasis omitted.) *Id.* The court held that these facts showed that the general contractor did not have control over the way the subcontractor conducted its work and thus did not retain control over its work. *Id.*

¶ 63    B&C's superintendent, Vincent Brandonisio, testified that he decides how to do the concrete work. He denied receiving daily tasks from the general contractor and denied that anyone from Metro directed his employees how to move or install concrete forms or footings. Wiberg does not dispute this. A B&C carpenter who worked on the job site, William Barry, testified that Brandonisio was "hands-on on what he wanted done pretty much every day." Wiberg testified that he took directions from Brandonisio and that he used B&C's tools, and he denied receiving safety training from Metro. Rather, B&C employed its own safety director, Ron Evenson, who was on-site every other day.

¶ 64    Wiberg points to two specific situations that, he argues, showed Metro retained control. First, Wiberg claims that he was unable to do concrete work in his own way because poor job site conditions forced him to use a hammer drill rather than stakes to make holes in the ground. However, this is irrelevant as to whether Metro controlled Wiberg's work: Wiberg testified that Mills told him he had to "deal with it"; Mills did not tell Wiberg *how* to deal with it. Mills did not tell Wiberg to use the hammer drill. Second, in his response to Metro's motion for summary judgment, Wiberg argued that Metro's director of construction exercised control when he requested a subcontractor (not B&C) to redo siding and trim on a couple of buildings. This

argument, too, is without merit, as Metro's ability to "prescribe alterations," as it did here, fits squarely within the language of comment c to section 414 of the Restatement (Second) of Torts as an example of general contractor rights that do *not* indicate control. See Restatement (Second) of Torts § 414 cmt. c (1965); *supra* ¶ 57. In other words, whether a subcontractor made alterations at the behest of the general contractor is irrelevant because it is not an indicator of retained control under the Restatement.

¶ 65     Wiberg also cites Soderman's expert opinion, which provided, in relevant part, that Metro "created the hazard by directing Brandonisio & Company to work in trenches, forming footings for concrete work, where the pathway was unsuitable and not safe due to the concrete debris and rebar that was on site." Whether this is true or not, it is irrelevant to the question of whether Metro controlled the operative aspects of Wiberg's concrete work. The expert's opinion deals only with Metro's alleged negligence in maintaining the job site and does not indicate that Metro controlled the incidental aspects of the concrete work. We are unpersuaded by Soderman's opinion that essentially attempts to equate a "controlling employer" under OSHA with retained control under the Restatement. This approach is misplaced. A "controlling employer" under OSHA means simply that the employer has general supervisory authority over the worksite, including the power to correct safety violations. By contrast, retained control under the Restatement requires the general contractor to control the operative details of a subcontractor's work. These are not the same. Soderman does *not* opine that Metro directed Wiberg how to install and move concrete forms, which would classify as incidental aspects. Accordingly, Soderman's opinion is largely irrelevant to our analysis.

¶ 66     Metro's superintendent, Timothy Mills, testified that he and Metro were committed to providing a safe work environment for employees. To that end, he would point out unsafe

conditions and instruct "whatever trade is responsible for those unsafe conditions" to correct them. He testified that he had the right to stop work in the event of an unsafe condition. Metro's director of construction, Christopher Arnold, also testified that it was within Metro's power to direct a subcontractor to remedy a safety hazard. Apart from safety, Wiberg states that it was Mills's job to check job site elevations to ensure they conformed to the project plans and specifications. According to the deposition transcript, Mills actually stated that this was the city inspector of Naperville's role, and not his. However, this discrepancy is irrelevant to our analysis, as we explain below.

¶ 67 Wiberg's contentions regarding Metro's conduct are essentially restatements of a general contractor's section 3.3.1 rights, which do not indicate retained control. Mills and Arnold explained that their roles included ensuring the safety of the job site. Assuming this is true, and regardless of the level of B&C's involvement in job site safety, ensuring that safety precautions are observed and the work is done safely does not amount to controlling the incidental aspects of the subcontractor's work. *Fonseca*, 2014 IL App (1st) 130308, ¶ 28. Accordingly, Mills's and Arnold's roles ensuring safety are insufficient to indicate retained control.

¶ 68 Even if Mills (rather than the city inspector) measured the job site elevations to ensure conformity with project plans, this would not be enough to indicate control. Comment c to section 414 of the Restatement (Second) of Torts provides that the supervisory right to inspect progress does not amount to control of operative details. Restatement (Second) of Torts § 414 cmt. c (1965).

¶ 69 In sum, Wiberg has not introduced any evidence to suggest that Metro controlled the day-to-day incidental aspects of Wiberg's concrete work, which, again, is what the theory of duty based on retained control requires. To the extent Wiberg has cited any disputes of fact, they are not relevant indicators of retained control. There is no dispute that B&C's superintendent,

Brandonisio, directed Wiberg how to perform the concrete work at the job site. There is no evidence that anyone from Metro instructed Wiberg or demanded that he perform the concrete work in any particular way. The method of performing concrete work was left to Wiberg and Brandonisio. In other words, the subcontractor, and not the general contractor, controlled the operative details of Wiberg's work. Because Wiberg did not introduce sufficient evidence to create a factual dispute, we hold that summary judgment was proper on the issue of retained control.

¶ 70                                     D. Open and Obvious Rule

¶ 71    Wiberg's second theory of liability is based on common-law premises liability. On appeal, he argues that the circuit court incorrectly applied the open and obvious rule to bar the imposition of duty under premises liability. In other words, he argues that the open and obvious rule does not apply in this case. Section 343 of the Restatement (Second) of Torts, which deals with premises liability, provides:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger."
> Restatement (Second) of Torts § 343 (1965).[3]

---

[3] Illinois adopted section 343 of the Restatement (Second) of Torts in *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 468 (1976).

¶ 72    However, under the open and obvious rule, a party "who owns or controls land is not required to foresee and protect against an injury if the potentially dangerous condition is open and obvious." *Rexroad v. City of Springfield*, 207 Ill. 2d 33, 44 (2003). The open and obvious rule is not a *per se* bar to duty; the court must still apply traditional duty analysis to the facts of the case. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 19. Under the traditional duty analysis, the court considers four factors in determining whether to impose liability: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Id.* ¶ 14.[4] The open and obvious rule affects the first two factors of the duty analysis. *Id.* ¶ 19. That is, where a condition is open and obvious, the reasonable foreseeability and likelihood of injury are slight. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 456-57 (1996). In other words, where a condition is open and obvious, the first two factors weigh against the imposition of duty.

¶ 73    A condition is open and obvious where a reasonable person in the plaintiff's position exercising ordinary perception, intelligence, and judgment would recognize the condition and risk involved. *Sandoval v. City of Chicago*, 357 Ill. App. 3d 1023, 1028 (2005). This determination depends on the objective knowledge of a reasonable person in the plaintiff's position, not on the subjective knowledge of the plaintiff himself. *Id.* Whether a condition is open and obvious is a question of law if there is no dispute about the physical nature of the condition. *Wilfong v. L.J. Dodd Construction*, 401 Ill. App. 3d 1044, 1053 (2010).

¶ 74    Here, the parties do not dispute the physical nature of the condition, which was a piece of concrete protruding six inches from a soil embankment in a trench. The parties also do not dispute

---

[4]On appeal, Wiberg does not argue that the circuit court erred in its application of the third and fourth factors, which it found weighed against the imposition of duty. We therefore limit our analysis to the first and second factors, which the open and obvious rule implicates.

that Wiberg stepped on the piece of concrete to enter and exit the trench and fell on his way back into the trench while carrying a 50-pound steel ply and stepping on the piece of concrete. As there is no dispute as to the condition, we may decide whether this condition was open and obvious as a matter of law. *Id.* We hold, as the circuit court did, that this condition was open and obvious.

¶ 75 A reasonable person in Wiberg's position would have recognized that a small piece of concrete protruding from soil could collapse under pressure. The soil could become loose, causing the concrete piece to fall out of the soil embankment. That scenario is especially likely when the full body weight of an adult man carrying a 50-pound piece of steel is applied to the piece of concrete. Wiberg also testified that he had slipped on loose stones in the area and that the job site was replete with concrete debris. A reasonable person with that knowledge would have avoided using debris as a stepping stone. Moreover, ramps providing access to the trench indicated that the safe and intended way to enter and exit the trench was by using the ramps, not by climbing on a small piece of unsecured concrete. A reasonable person without any knowledge of concrete structures would have recognized the potentially dangerous nature of entering and exiting the trench using a six-inch piece of concrete protruding from dirt, let alone an experienced construction worker.

¶ 76 Wiberg argues that, even if the protruding concrete constituted an open and obvious condition, two exceptions to the open and obvious rule apply: distraction and deliberate encounter. First, the distraction exception applies "where the possessor [of land] has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." (Internal quotation marks omitted.) *Bruns*, 2014 IL 116998, ¶ 20. Here, there is no evidence that Wiberg was distracted. The only other thing Wiberg was doing when he stepped on the concrete piece was holding a steel ply, and there

is no indication that simply holding a piece of steel somehow distracted him. Second, the deliberate encounter exception applies "where the possessor [of land] has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." (Internal quotation marks omitted.) *Id.* There was no reason for Metro to anticipate that Wiberg would use the small protruding concrete piece to enter and exit the trench. Based largely on B&C's employees' testimony, Metro identified at least seven safer alternatives for Wiberg to complete his job that did not require stepping on the concrete piece. Moreover, Wiberg's superintendent told him to stay in the trench and work while other laborers brought him the materials he needed. One B&C employee even stated that he had never seen anyone in his more-than-30-year career enter and exit job site trenches the way Wiberg did. Metro had no reason to anticipate that Wiberg would enter and exit the trench using an unstable piece of concrete that was never intended for that purpose.

¶ 77    Based on the foregoing, the circuit court correctly held that the open and obvious rule applied.

¶ 78                                      III. CONCLUSION

¶ 79    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 80    Affirmed.

*Wiberg v. Metro Storage, LLC*, 2024 IL App (1st) 240271

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-L-1296; the Hon. Anthony C. Swanagan and the Hon. Michael F. Otto, Judges, presiding. |
| **Attorneys for Appellant:** | Lisa M. Longo, of Morici, Longo & Associates, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jessica A. Biagi and Ashley S. Koda, of Costello Ginex & Wideikis, P.C., of Chicago, for appellee. |